Joan Rubino et. al., Appellants, v City of New York et al., Respondents.

First Department, February 27, 1986

244

**APPEARANCES OF COUNSEL**

*Frederic M. Gold* of counsel *(Philip J. Dinhofer* with him on the brief; *Jesse C. Sable,* attorney), for appellants.

*Elizabeth S. Natrella* of counsel *(Larry A. Sonnenshein* with her on the brief; *Frederick A. O. Schwarz, Jr., Corporation Counsel,* attorney), for respondents.

**OPINION OF THE COURT**

ELLERIN, J.

The proof presented in this case was sufficient to establish prima facie, that the defendant Board of Education acted negligently in its proprietary capacity as landlord of the school premises where plaintiff teacher was injured, and that, therefore, the trial court improperly granted said defendant's motion to dismiss at the close of plaintiff's case.

The subject accident occurred on April 21, 1980 in the school yard of the Monterrey Annex of P.S. 59 in The Bronx while plaintiff, Rose Rubino, a special education teacher employed by the defendant Board of Education, was supervising a class of learning disabled children. The Annex was located a few blocks from the school's main building where Ms. Rubino had previously served as a regular classroom teacher.

Commencing with the September 1979 term, Ms. Rubino functioned as a "cluster teacher" which involved the covering of 25 classes a week during which she taught the course "Learning Through Movement". While most of her classes were held in the main building, on two days a week Ms. Rubino was also assigned to classes at the Annex. On the day of the accident, she followed the schedule that was typical of her activities on the days that she worked at the Annex. First she taught classes at the main building and then traveled to the Monterrey Annex to handle two classes there, one before and one after lunch. On the day in question, which was

characterized as a beautiful spring day, she promised the latter class that she would take them outside into the school yard if they finished their work before the period ended and she did so at about 2:15 P.M. Mrs. Rubino observed the activities of the children while she was seated in a chair placed so as to keep propped open the school door which could not be opened from the outside. After they had been in the yard for some 5 to 10 minutes, a heavy cylindrical metal object came hurtling through the air, striking Mrs. Rubino on the left knee and causing her the physical injuries for which she seeks recovery herein.

The uncontradicted testimony at the trial established that this was far from an isolated incident of foreign objects or debris being thrown into the school yard from the neighboring apartment building and lot. Ms. Rogan, a teacher who had taught at the Annex from 1972 to 1978, prior to plaintiff's presence there, testified to the number of such incidents that occurred during the period that she worked at that facility. She indicated that she had reported these incidents to Mrs. Bennett, the then assistant principal in charge of the Annex, who in turn had individually warned and directed the teachers then assigned to the school not to use the yard. It appears that this directive was not enforced nor adhered to for any extended period.

Testimony was also given by Ms. Carbone and Ms. Dolly, two teachers who were assigned to the school during 1980, with respect to incidents of cans, bottles and other objects being hurled into the school yard from the empty lot and building adjacent to the school yard during the period shortly before the date that plaintiff suffered her injury. It was noted by Ms. Dolly that the empty lot next to the yard was "full of junk" and "just a gold mine" for those desirous of propelling objects into the school yard. Both teachers testified that in March of 1980 they had notified Ms. Caneja, the teacher in charge of the Annex at that time, about these incidents. Aside from thanking the person "for telling me", it does not appear that Ms. Caneja took any action whatever, either by way of directing that the yard not be used or by way of a simple warning, either oral or written, to advise teachers on the premises that this situation existed and was a potential source of danger to those using the yard.

It is undisputed that the plaintiff, Ms. Rubino, who taught at the Annex only two days a week in the course of a hectic schedule, had no personal knowledge of the history of these

incidents. Moreover, she had received no warning or notice from the teacher in charge about this condition, there were no discussions about such matter at staff meetings nor were any instructions or regulations, oral or written, issued that either prohibited use of the school yard or in any way alerted a teacher to the risks attendant upon the use of the yard.

In granting the motion to dismiss, the trial court relied upon the authorities cited in the dissent and adopted the position urged by defendants, that is, that they were acting in the performance of a governmental function in the operation of the school premises and were thus immune from liability absent a showing of a special duty owed to the individual claimant. The dissent is similarly posited.

We disagree and conclude that the instant situation does not involve the performance of a governmental function but, rather, arises from an alleged breach of duty by the defendant Board of Education in its proprietary capacity as the landlord of the school yard premises in issue.

The dichotomy between "governmental" and "proprietary" functions exercised by a public entity has evoked extensive judicial interpretation within the contexts of particular factual settings which are often sought to be inappropriately extended to factual predicates which may bear certain superficial similarities but which substantively fall into a wholly different category. This is pointedly illustrated here by the dissent's reliance on the decisions in *Glick v City of New York* (53 AD2d 528, *affd* 42 NY2d 831) and *Vitale v City of New York* (60 NY2d 861) which are similar to the instant case only in that those cases, too, involved injuries to school teachers while on school premises. While in the *Glick* case the teacher was raped by a student who had somehow gained entry into the normally locked lady's room and in the *Vitale* case the teacher was assaulted by one of the students as he sought to break up an altercation in the hallway of the school, the underlying thrust of the claim in each case was the failure to provide adequate security in the general "police protection" sense of preserving law and order and controlling the activities of criminal wrongdoers. This, of course, has classically been considered a "governmental function" involving the allocation and deployment of available police resources. *(See, Bass v City of New York,* 38 AD2d 407, 416, *affd* 32 NY2d 894; *Riss v City of New York,* 22 NY2d 579, 581.)* That, however, is not the basis of the instant action. The defendant Board is not being charged with negligence because it failed to have police

or security guards stationed in the school yard or surrounding area to prevent or deter object-propelling incidents. Such activities clearly fall within the "governmental function" of providing police protection in a general sense and would afford no basis for liability to a particular individual. The charge of negligence here is quite different. It is predicated upon the defendant's failure in its proprietary capacity as landlord, to issue warnings, or otherwise take appropriate action, with respect to the known and foreseeable dangers posed by incidents of this type to those, such as plaintiff, who could be expected to use the school yard property controlled by defendant.

Recent decisions by our Court of Appeals, rendered after Trial Term's dismissal of the instant case, have brought into sharper focus the demarcation between "governmental" and "proprietary" functions in a manner particularly relevant to the situation here in issue. In *Miller v State of New York* (62 NY2d 506, 510, 511), then Chief Judge Cooke reiterated the long-standing principle that "[p]ublic entities remain immune from negligence claims arising out of the performance of their governmental functions, including police protection, unless the injured person establishes a special relationship with the entity", but emphasized that "when the State acts in a proprietary capacity as a landlord, it is subject to the same principles of tort law as is a private landlord".

That perspective has been further strengthened by the decision in *Schrempf v State of New York* (66 NY2d 289). In rejecting the State's argument that, absent a special duty to the party injured, it could not be held liable for claims arising out of its providing medical and psychiatric care to the mental patient who inflicted the harm, Chief Judge Wachtler made clear (p 293) that the governmental activities to which immunity attached are those "such as providing police and fire protection or law enforcement generally" and not those where the State engages in a proprietary function in which case it is held to the same duty of care as private individuals and institutions engaging in the same activity.

The underpinning of the dissent is that no liability can attach here because "the operation of the common schools of the City of New York is a governmental function" and the Board has assumed no special relationship to the plaintiff. This posture, however, ignores the import of the holding in *Miller v State of New York (supra,* at p 511) that a public entity can act in a dual role, on the one hand in a proprietary

capacity as a landlord by virtue of ownership and control, in that case of the university campus, while at the same time also acting in a governmental capacity.

To assist in discerning the character of particular actions when a public entity engages in such dual role, the opinion in *Miller* suggests the following mechanism for qualitative measurement: "A governmental entity's conduct may fall along a continuum of responsibility to individuals and society deriving from its governmental and proprietary functions. This begins with the simplest matters directly concerning a piece of property for which the entity acting as landlord has a certain duty of care, for example, the repair of steps or the maintenance of doors in an apartment building. The spectrum extends gradually out to more complex measures of safety and security for a greater area and populace, whereupon the actions increasingly, *and at a certain point only, involve governmental functions, for example, the maintenance of general police and fire protection.* Consequently, any issue relating to the safety or security of an individual claimant must be carefully scrutinized to determine the point along the continuum that the State's alleged negligent action falls into, either a proprietary or governmental category." (62 NY2d, at pp 511-512; emphasis added.)

Thus, in the *Miller* case, the failure to lock the outer doors of the State-operated college dormitory, which resulted in the rape of the student plaintiff by an intruder, was held not to involve the governmental function of providing or maintaining general police protection but, rather, to relate to an issue of security falling within the proprietary functions of a landowner who is charged with " ' " 'maintaining his property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk' " ' " *(supra,* at p 513, citing *Preston v State of New York,* 59 NY2d 997, 998, quoting *Basso v Miller,* 40 NY2d 233, 241). This standard imposes upon a landlord the duty *to maintain minimal security measures, related to a specific building itself,* in the face of foreseeable criminal intrusion upon tenants. *(Miller v State of New York, supra,* at p 513, citing *Nallan v Helmsley-Spear, Inc.,* 50 NY2d 507.)

The instant case, too, clearly falls within that segment of the "continuum of responsibility" deriving from defendant Board's proprietary functions as the landlord of the school yard where the injury occurred. Having knowledge of the

hazardous condition caused by foreign objects and debris being periodically hurled into its school yard from the adjacent properties, the defendant, as any landlord, was under a duty to take such steps in the management of its property as were reasonably necessary to prevent injuries to teachers and students from such foreseeable dangers. Toward that end, there were several possible avenues available, none of which would have constituted an unreasonable burden upon the Board. It could have prohibited the use of the yard by teachers and students either by way of an appropriate locking device that would have secured the door from inside the building as well as from outside, or by way of enforcing appropriate warnings and/or directives that the yard not be used, or both. In this case, not only were no such steps taken, but defendant failed in any way to warn plaintiff or provide her with even minimal information as to the periodic occurrence of such incidents which would, at least, have enabled her to make a knowledgable decision as to whether or not to use the yard in light of such foreseeable risks and dangers.

Contrary to the defendant Board's assertion, obligations to adequately warn of known risks and dangers in the use of a school yard and/or to take appropriate steps to prevent use by teachers and students of that yard in light of such risks cannot be equated to the governmental function of providing or maintaining police protection generally. The wrongdoing charge here in no way involves the allocation or deployment of police resources or activities but, on the contrary, stems from a failure to fulfill proprietary duties traditionally imposed on landlords or landowners to maintain their property in a reasonable safe condition in view of all the circumstances, including the likelihood of injury to others and the burden of avoiding the risk. *(Miller v State of New York, supra; Preston v State of New York, supra,* pp 998-999; *cf. Crosland v New York City Tr. Auth.,* 110 AD2d 148.)

Accordingly, the judgment, Supreme Court, Bronx County (Callahan, J.), entered on April 27, 1984, should be modified, on the law, insofar as it directs a dismissal of the complaint against the defendant Board of Education, the complaint should be reinstated, a new trial directed as against that defendant, and, as so modified, should otherwise be affirmed, without costs or disbursements.

BLOOM, J. (dissenting in part). We are all in agreement that, at the close of plaintiffs' case, the trial court properly dis-

missed the case as against defendant, the City of New York. My point of divergence arises from the dismissal as against defendant, the Board of Education. My colleagues are of the opinion that this was improper. Accordingly, they would reverse and remand the matter for a new trial as against the Board only. Inasmuch as I am of the opinion that the trial court properly dismissed the action as to both defendants, I dissent and would affirm.

At the times pertinent to this action, plaintiff Joan Rubino was employed as a "cluster" teacher by the Board. Included among her duties was the conducting of classes for emotionally disturbed students, classes for regular students and classes for those specially gifted.

Mrs. Rubino was assigned to P.S. 59 in The Bronx, located on Bathgate Avenue, some blocks north of Tremont Avenue. Her duties required her to spend time at the Monterrey Annex of P.S. 59, located approximately 2 or 3 blocks distant from the main building.

The Monterrey Annex is a one-story building, shaped in the form of a V or U, with a play yard located in the middle. The yard is totally enclosed; on one side by the school building, and, on the other, by a link fence reaching almost to the height of the school building. Bordering the fence is an apartment building and an empty lot.

The evidence at the trial, which was limited to the issue of liability only, indicated that on April 21, 1980, Mrs. Rubino had taught a class immediately preceding the lunch period, covered the lunch period and then taken the lunch period class, her second class of the day, to the school yard. However, a fight broke out among the children and she husbanded them back into the school building. At the time, she promised them that if they completed their regular work before the period ended she would again take them to the yard. The regular work was completed at about 2:15 P.M. and the children and Mrs. Rubino returned to the yard. Some 5 or 10 minutes later, a cylindrical metal object which weighed some 4¾ ounces, having a diameter of three quarters of an inch and a depth of 1¼ inches came hurtling over the link fence and struck Mrs. Rubino in the left knee. She testified that some of the children screamed that "some boys had thrown something at me", testimony which the trial court permitted under the excited utterance exception to the hearsay rule. After Mrs. Rubino was hit by the object she fell to the ground. Another teacher

helped her into the school building and shortly thereafter she was taken to the hospital.

Additionally, there was testimony that, over a four-year period, running from 1974 to 1978, some two years prior to the incident here involved, there were several occasions on which raw eggs, buckets of water, rubble and debris had been thrown into the yard and that, by reason thereof, the assistant principal then in charge of the Annex had directed that the school yard not be used, a directive which, apparently, was ignored. Other testimony indicated that some 2 or 3 such incidents had occurred subsequent to 1978 and as late as January, February or March 1980.

At the close of plaintiffs' case, defendants moved to dismiss on the ground that plaintiffs had failed to establish a prima facie cause of action. After extended legal argument the trial court recessed for the day. The following morning the court opened the proceeding with the following statement: "After much blood and sweat and tears and being up at 5:30 this morning, I have come to the unhappy conclusion that I must dismiss the complaint". It then proceeded to read into the record its formal decision.

At trial, as in this court, plaintiffs recognized the dichotomy, long embodied in the law, which fixed liability on a governmental entity on the basis of ordinary negligence when such entity is acting in a proprietary capacity (Miller v State of New York, 62 NY2d 506; Preston v State of New York, 59 NY2d 997), but which exempts such entity from liability for negligence when acting in the performance of a governmental function unless it has assumed a special relationship or responsibility to the person injured (Sorichetti v City of New York, 65 NY2d 461; Weiner v Metropolitan Transp. Auth., 55 NY2d 175; Vitale v City of New York, 60 NY2d 861; Riss v City of New York, 22 NY2d 579; Schuster v City of New York, 5 NY2d 75; Garrett v Town of Greece, 78 AD2d 773, affd 55 NY2d 774; Glick v City of New York, 53 AD2d 528, affd 42 NY2d 831). However, plaintiffs argue that the maintenance of schools, colleges, housing developments and other functions are performed by private as well as governmental bodies and are, therefore, entitled to no greater immunity than are these private institutions. With this as foundation stone, plaintiffs proceed to argue that, by reason of the prior incidents, it was foreseeable that injury would occur and the failure of the Board to guard against recurrence subjected it to liability.

The argument, however carefully crafted, falls because its major premise is flawed. NY Constitution, art XI, § 1 expressly provides: "The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated". Pursuant to the authority vested in it by the Constitution, the Legislature has enacted a comprehensive Education Law which makes compulsory the attendance at school of minors between the ages of 6 and 16 (§ 3205) and specifies the nature of the instruction to be given (§ 3204). It further provides for the acquisition of sites at which such instruction is to be given and delegates the day-to-day operation to Boards of Education and professional staffs. It also provides for the selection of teachers and supervisory staff and the salaries which shall be paid to them. In addition, it provides that there shall be school budgets and the manner in which they shall be fixed. In sum, the entire organizational structure of the school system is mandated by law. All that remains open is the day-to-day operation of the classroom.

This complete control of the primary and secondary school system pyramids upward into the office of the Commissioner of Education who "shall have general supervision over all schools and institutions which are subject to the provisions of this chapter, or of any statute relating to education" (§ 305 [2]). In sum, these provisions make abundantly clear that the operation of the common schools of the City of New York is a governmental function. The operation of that system is delegated to the Board of Education and through it to local community boards.

Since it is not claimed that the Board assumed any special relationship or responsibility to Mrs. Rubino, no liability accrued to it for the injury suffered by her.

Plaintiffs place great reliance on *Miller v State of New York* (62 NY2d 506, *supra)* to support their claim that the Board, in the operation of the school system, is acting in a proprietary capacity. In that case, plaintiff was a student at a State university and resided in a dormitory owned and operated by the school. She was confronted in the laundry room of her residence hall by a man wielding a "large butcher knife", who dragged her to a third floor dormitory room and there raped her twice. In her action against the State she advanced two separate theories of liability; one predicated on the failure of the university to provide adequate police protection and the other, that in renting dormitory rooms to students, it was

acting as a landlord, i.e., in a proprietary capacity, and hence, was entitled to no greater immunity than a private landlord. While the first theory was held inadequate to establish liability, the second theory was sustained. As landlord, the university was held to the same accountability as a private landlord under the principles of tort law *(Nallan v Helmsley-Spear, Inc.,* 50 NY2d 507; *Loeser v Nathan Hale Gardens,* 73 AD2d 187; *Sherman v Concourse Realty Corp.,* 47 AD2d 134).

That *Miller (supra)* is not applicable to the facts in this case is made abundantly clear by *Glick v City of New York* (53 AD2d 528, *affd* 42 NY2d 831, *supra)* and *Vitale v City of New York* (60 NY2d 861, *supra).* In *Glick,* a teacher was raped by a student in a teachers' ladies' room. In *Vitale* a teacher was assaulted by one of the students when he sought to break up an altercation in the hallway of the school. In each case liability was sought to be bottomed on the failure to provide adequate protection. In each case governmental immunity was invoked and sustained on the ground that no special relationship existed and, in the absence of a special duty, no liability existed.

In these circumstances, I am of the opinion that the trial court properly determined that the Board was not liable. Accordingly, I would affirm the judgment appealed from.

MURPHY, P. J., SANDLER and ASCH, JJ., concur with ELLERIN, J.; BLOOM, J., dissents in part in a separate opinion.

Judgment, Supreme Court, Bronx County, entered on April 27, 1984, unanimously modified, on the law, insofar as it directs a dismissal of the complaint against the defendant Board of Education, the complaint reinstated, a new trial directed as against that defendant, and, as so modified, otherwise affirmed, without costs and without disbursements.