■ ARLEN S. YALKUT, Appellant, v CITY OF NEW YORK et al., Respondents.—Order, Appellate Term, First Department (Jawn Sandifer, J. P., Edith Miller and William McCooe, JJ.), entered March 20, 1989, which reversed an order of the Civil Court, Bronx County (Robert Silverson, J.), entered on or about July 23, 1986, which had set aside the jury verdict with respect to apportionment of liability and conditionally ordered a new trial on that issue only, unanimously reversed, on the law, and the order of the Civil Court reinstated, without costs.

This is an action in negligence brought by Arlen Yalkut, an attorney, against the City of New York and the Department of Correction of the City of New York, as defendants, to recover for injuries suffered when Yalkut was assaulted by an incarcerated prisoner who was in the care and custody of defendants.

Plaintiff, a member of the 18-b panel, was assigned to represent one Gladstone Oglivie, who was charged with assaulting a correction officer at Rikers Island. Oglivie asserted that the correction officer struck him first and that he had acted in self-defense. Several fellow inmates were witnesses to the incident, and Yalkut, as Oglivie's attorney, obtained judicial orders to produce these witnesses from the various correctional institutions where they were then lodged. Terry Thompson, a convicted murderer, was one of these witnesses, who was transported from Dannemora to New York City where he was interviewed by Mr. Yalkut at the 4M level of the Bronx County Courthouse. As an experienced criminal attorney, Yalkut was familiar with the area as a result of his previous representation of criminal defendants. To enter the interview area an attorney would pass through a steel door guarded by a correction officer and sign a logbook, after which the attorney would be escorted by the correction officer approximately one third of the way down a 110-foot-long corridor, with the officer returning to his post at the door while the attorney proceeded alone to the end of the corridor which then continued around a corner, at a 90-degree angle where the entry to the attorney interview rooms was located. The interview rooms were eight-by-eight-foot cubicles, separated from the corridor by a three-foot-high solid wall, topped off by glass walls to the ceiling. Each interview room contained a desk and chairs, with no protective divider between the attorney and the inmate. Correction officers assigned to 4M testified at the trial that they were routinely assigned to fixed posts at the entry end of the corridor, from which position they were unable to see the attorney interview rooms.

At Yalkut's first meeting with Thompson on January 4, 1982, a good relationship was established and Thompson indicated his willingness to appear as a witness for Oglivie. Thompson next was interviewed by Mr. Yalkut on January 7, when Thompson expressed concern about personal clothing and legal papers which were allegedly lost by the Correction Department when he was transported from Dannemora. Due to a delay in the Oglivie trial, the attorney subsequently met with Thompson in the interview rooms on January 11, 12, and 13. On the 13th, Yalkut was informed that Thompson wished to talk with the Trial Judge because of his frustration with the delays in his testimony, and because of his problem with the lost clothing and papers. The Trial Judge declined to bring Thompson into the courtroom unless Mr. Yalkut was prepared to call him as his first witness. When Yalkut replied that he did not know if he wanted to use Thompson first because he might be hostile due to his perceived mistreatment by the court system, the court suggested that the attorney go down to speak with Thompson. Since the Oglivie case was being tried in a Civil Court courtroom, with no adjoining holding pen, the Judge, for security reasons, did not want Thompson produced until he was definitely ready to testify. Accordingly, Yalkut went downstairs to the 4M area to again interview Thompson. On this occasion, after he entered the interview room, Thompson savagely beat Yalkut, kicking him and then knocking him unconscious. Attorneys interviewing clients in the adjoining cubicles came to Yalkut's aid, and alerted several correction officers who arrived shortly thereafter.

Plaintiff Yalkut introduced evidence that the defendants were aware of Thompson's especially violent nature but failed to warn him of Thompson's dangerous propensities or take appropriate measures to carefully supervise Thompson. The then-Deputy Warden, James Frierson, testified that he knew that Thompson had been involved in fights with other inmates at Rikers Island a few days before this incident. Correction Officer Tyrone Lindquist, who was on duty at the front door of the 4M area at the time of the incident, testified that he had been aware of Thompson's propensities since 1979, when he had stabbed a fellow inmate 32 times, and he recalled another incident when Thompson had attempted to assault correction officers in the Bronx Criminal Court Building. At the time of Thompson's own trial, he had been classified as a "central monitor case" (CMC), a classification for known escapists or notorious individuals with assaultive tendencies, who were escorted in leg irons and handcuffs by a captain. However, at

the time of the incident here in issue, Thompson was not classified CMC. Correction Officer Carlton Pitman, who was assigned to the 4M area at the time of this incident, testified that he too was familiar with Thompson's violent tendencies. He recalled an incident three or four months prior to the attack on Mr. Yalkut when Thompson destroyed government property in the courthouse, and had to be restrained by six or seven officers. Finally, another attorney, Legal Aid lawyer David Clarke, testified that, one month prior to this incident, he had been assaulted by a client whom he was interviewing in the same 4M area and was saved from serious injury only by the intervention of another inmate, since no guards or correction officers were posted within sight of the interview rooms.

Based on this evidence, the jury unanimously found, by special verdict, that the defendants were negligent, that their negligence was a proximate cause of plaintiff's injuries and that plaintiff was himself contributorily negligent. In apportioning liability, the jury attributed 75% of the fault to the plaintiff and 25% to the defendants.

Upon the plaintiff's motion to set aside so much of the verdict as found him negligent and apportioned his negligence at 75%, as against the weight of the evidence, the trial court (Robert Silverson, J.), granted the motion to the extent of setting aside that portion of the verdict which apportioned liability and directing a new trial on the issue unless the defendants consented to apportionment in the amount of 80% against the defendants and 20% against the plaintiff. The court reasoned that there was some evidence from which it could be found that the plaintiff should have perceived some risk to his safety when interviewing this unguarded agitated convict, and that his failure to perceive such risk was negligence and a contributing factor to his injury. However, the court found that the degree of plaintiff's negligence was comparatively de minimis, and that, viewing the totality of the circumstances and examining the weight of the evidence that supported the jury's findings as to apportionment, the result was an "unfair interpretation of the evidence".

The Appellate Term reversed and reinstated the jury's verdict. That court found that the evidence sufficiently provided a rational basis for the jury's finding, and that the trial court abused its discretion and " ' "usurped the jury's fact-finding duty" ' ".

We reverse and reinstate the trial court's well-supported exercise of its discretion.

In distinction to the harsher "no rational basis" standard which must be overcome before concluding that a jury verdict, as a matter of law, is not supported by sufficient evidence, the question of whether a jury verdict is against the weight of the evidence involves a less rigorous standard and is essentially a discretionary and factual determination involving a balancing of many factors. *(Cohen v Hallmark Cards,* 45 NY2d 493, 498-499.) The operative consideration in invoking the court's discretion in the latter case is a finding that the jury could not have reached its verdict on any fair interpretation of the evidence. *(See, Nicastro v Park,* 113 AD2d 129, 134.) While the discretionary power of a trial court to set aside a jury's verdict as against the weight of the evidence must be exercised with considerable caution, upon appellate review of the exercise of that power great respect must be accorded to the trial court's professional judgment in that regard since that court heard and saw the witnesses testify and was in the best position to properly assess the evidence presented at the trial and to observe courtroom events that might have influenced the jury's evaluation of that evidence. *(Nicastro v Park, supra,* at 136-137, and cases therein cited.)

In the foregoing context, we conclude that the trial court properly exercised its discretion in setting aside the jury's verdict in this case with respect to the issue of apportionment.

There was abundant evidence establishing the negligence on the part of defendants which directly contributed to the injuries suffered by plaintiff. In light of the design and location of the interview booths, the manner in which they were operated and controlled was clearly unsafe. Officers were placed only at the doorway at the far end of a 110-foot corridor where they physically could not observe the booths which were located out of their view around a 90-degree bend at the other end of the long hallway. Nor were they able to hear any disturbances that might be taking place in those booths where frequently violent prisoners were left alone and unguarded in a room with attorneys. Just a month earlier, an inmate had beaten an attorney in one of these booths, beyond the surveillance of the officers, but no steps were taken to remedy the situation despite this actual notice of the hazard involved. The presence of officers within sight of the interview booths would have served both as an inhibiting factor to prisoner violence as well as providing the ability to immediately curb any acting out of violence by a prisoner. Insofar as Thompson, specifically, was concerned, the defendants were well aware of his dangerous nature yet failed to take any

steps to safeguard the attorney, Yalkut, who was alone with him in the isolated interview booth, nor did defendants even give the attorney some warning of the potential danger which Thompson posed. Defendants knew that Thompson had a history of extremely violent behavior and, indeed, had, in fact, exhibited his violent nature a few days earlier by assaulting fellow inmates. Moreover, having custody of Thompson, the defendants were aware that he was becoming increasingly agitated because his testimony had been delayed due to circumstances beyond plaintiff's control, yet they took no steps whatsoever to either warn or safeguard Yalkut from this potentially dangerous situation.

In contrast to the factual underpinnings of defendants' negligence, plaintiff's failure to perceive the risk of violent behavior against him by Thompson must be viewed in light of his lack of knowledge as to Thompson's prior history and the unexceptional prior relations that he had had with the prisoner-witness as well as his obligation, as a lawyer required to represent his client Oglivie to the fullest, to ascertain whether Thompson's appearance as a witness would, in fact, be beneficial to his client's cause. In that context, plaintiff's conduct, while it may have demonstrated some lack of vigilance in failing to perceive the possible risk of violence to himself by Thompson, cannot be said under any fair interpretation of the evidence to have constituted a major contributing factor of his injuries.

Accordingly, we find that the trial court properly set aside, as against the weight of the evidence, that part of the jury's verdict which apportioned the respective faults of the parties and its order, which provides for an appropriate alternative, should be reinstated. Concur—Kupferman, J. P., Carro, Rosenberger, Ellerin and Rubin, JJ.