[676 NYS2d 38]

ERIC A. JOHNSON, Individually and as Administrator of the Estate of KATHRYN HINNANT JOHNSON, Deceased, Appellant, v NEW YORK CITY HEALTH AND HOSPITALS CORPORATION, Respondent, et al., Defendants.

First Department, June 18, 1998

## APPEARANCES OF COUNSEL

*Thomas A. Moore* of counsel, New York City (*Matthew Gaier* and *Norman Bard* on the brief; *Kramer, Dillof, Tessel, Duffy & Moore,* attorneys), for appellant.

*Margaret G. King* of counsel, New York City (*Stephen J. McGrath* on the brief; *Paul A. Crotty, Corporation Counsel* of New York City, attorney), for respondent.

## OPINION OF THE COURT

WILLIAMS, J.

Plaintiff Eric A. Johnson brought a wrongful death action seeking damages for defendants' negligence in failing to provide minimal security to protect his wife, Dr. Kathryn Hinnant, a pathologist at Bellevue Hospital Center (Bellevue). Dr. Hinnant was murdered and sexually assaulted in her office on Saturday, January 7, 1989 at approximately 4:00 P.M. by Steven Smith, a homeless intruder who had recently been a patient at the hospital.

This appeal seeks to overturn a judgment in favor of defendant New York City Health and Hospitals Corporation (HHC) following posttrial denial of plaintiff's motion to set aside the jury verdict as against the weight of the evidence. The jury found, by a vote of 10 to 2, that HHC's security measures were reasonable.

The trial evidence showed that at the time in question, Bellevue, a 1,000-bed public hospital in New York City with approximately 4,000 employees, had a mandate "to provide the

best care to anyone regardless of their ability to pay". It treated many patients with antisocial personality disorders stemming from problems such as drug use or domestic violence. It had over 100 clinics and logged over 300,000 total clinic visits in 1988-1989. The psychiatric walk-in clinic logged over 30,000 annual visits, the emergency room about 100,000 visits. There were approximately 300 beds for psychiatric patients. There was also an adjoining 1,000-bed homeless shelter run by the New York City Human Resources Administration.

The hospital center's enormous physical plant encompassed approximately one million square feet in several separate buildings with numerous entryways. In the "new" building, where Dr. Hinnant was attacked, each of the 22 floors covered one acre. The new building and an adjacent building shared a huge basement area that contained laundry, storage and maintenance facilities as well as the morgue. There was also a tunnel that connected the basement to the basement of the homeless shelter.

The hospital's security system at the time employed 65 to 70 security officers. They were deployed in both uniform and plainclothes, at fixed posts and in roving patrols, in three shifts around the clock throughout the hospital grounds. The officers meticulously recorded all security-related incidents in a security log, relevant portions of which were entered into evidence. The tunnel between the hospital and the homeless shelter was secured by an around-the-clock, manned security post at the top of a ramp leading into the shelter. Also, there were pulldown gates at either end of the tunnel which were lowered on weekends and at night; whenever the gate was up at the shelter end, a Bellevue security officer was stationed there. The tunnel gates could not be closed at all times because of the volume of legitimate traffic between the hospital and the shelter. As a practical matter, the concern with security had to be balanced against the need for access and movement of patients, visitors and hospital staff.

One noteworthy security problem was the employees' habit of taping or jamming stairwell doors open to permit easy access between floors, since the elevators were slow. Employees persisted in this habit despite constant instructions to cease. Security personnel were placed on notice of the problem and were directed to constantly look out for it, rectify it if possible and if not, to note the need for repair in an incident report to maintenance and in their memo books.

Hospital policy as to intruders required employees to notify security of any sighting of unauthorized persons. Security

personnel would question such persons, check out their explanations if necessary, and, in their discretion, could arrest them, escort them out of the building, escort them to the proper treatment area or take other appropriate action. Homeless men found in the hospital basement would be ejected by the security staff. The security staff also had to accommodate several requirements imposed on the hospital, such as keeping fire safety doors unlocked and the sheltering of the homeless in accordance with the City's "cold alert" policy. Malingerers and disruptive persons were routinely ejected.

Prior to the attack on Dr. Hinnant, there had been one murder, of a homeless man, on the hospital grounds, and two rapes, one in 1984, the other in 1988. Generally, however, the most common crimes were pilferage, usually by hospital employees, or fights among patients. These were most often resolved by security officers without an arrest or summons.

At the time of the crime, Steven Smith was a homeless, unemployed 23 year old. When initially admitted to Bellevue on December 18, 1988, he had allegedly ingested rat poison and was suffering from suicidal ideation; an examination revealed only "inappropriate affect". He stated that for the past three years he had abused drugs and alcohol and that his condition had recently worsened. His cocaine abuse, verified by urinalysis, had ruined his relationship with his mother because he had been stealing increasing amounts of money from her. Also, at the age of 14, he allegedly had been under psychiatric care at Kings County Hospital for hearing voices. A hospital social worker, noting this history, as well as a criminal history involving many robberies, recommended continued psychiatric care, medication and close observation.

On December 21, he was to be discharged and was given a referral to Bellevue's walk-in psychiatric clinic, but he refused to leave and his departure was postponed a day. The next day, upon discharge, he immediately ingested more rat poison and was readmitted, at which time he apparently had a tantrum. On December 23, he was seen walking the ward in street clothes, and later "eloped", or disappeared from his room, for several hours, having used pillows to make it appear that he was still in bed. The elopement was reported to hospital security. Upon his return, he claimed to have taken care of some business and had been sleeping in a lounge on the 15th floor. Subsequently, he had a verbal altercation with another patient, which hospital security wrote up, and was placed on a watch in connection with which all sharp objects were removed from his possession.

That same day, the attending physician had found him relaxing in bed, chatting with the female staff. When the physician began interviewing him, he began to threaten suicide and homicide in an effort to manipulate the physician into obtaining him a hotel room, since he did not want to go to a shelter. The physician perceived no sign of psychosis or depression and believed Smith to be at "baseline psychological functioning".

On the 24th, another psychiatrist noted in her report that Smith was "very oppositional", had reluctantly admitted visiting a friend on the 15th floor, but denied using drugs in the hospital, and again threatened suicide in a manipulative way. The doctor concluded that Smith was antisocial with a personality disorder and cocaine abuse, but not acutely suicidal or dangerous to himself or to others. The recommendation was that he undergo urine toxicity testing and that he be placed under a watch to prevent another elopement or drug abuse.

On December 25, 1988, he was absent from his room most of the day, but was thought to be elsewhere on the floor. The next day, he appeared to be in a good mood and sociable. Later, he refused any professional consultation and became verbally abusive, but nevertheless was found ready for discharge and escorted off the premises, allegedly a fairly routine occurrence and not indicative of dangerousness.

On January 1, 1989, a patient reported that a person matching Smith's description had been in her room at 4:00 A.M. that day, and hospital security investigated. The same day, a nurse observed a person of similar description roaming Ward 17N in the late afternoon; that evening another nurse saw Smith. Security responded quickly to both of the later sightings and, in the evening, caught Smith apparently stealing a clock and a hypodermic needle and arrested him on charges of burglary in the third degree and criminal possession of stolen property. He was calm and cooperative at that time.

Smith was released on his own recognizance on January 3 and later was observed at the hospital that day wearing patient's clothing; the nurse did not question his presence. At 7:15 A.M. the next day, another nurse on the 21st floor contacted security when she found Smith locked in a therapy area. The security officer was unaware of Smith's recent arrest at the hospital and took him to an emergency services walk-in clinic. Testimony by the then director of security for Bellevue, as well as by an attending psychiatrist at Bellevue, indicated that at this point there should have been some concern about

how Smith got to the 21st floor, about keeping Smith out of the hospital, and that perhaps a description of him should have been circulated to some extent among hospital staff. However, the security director did not believe, given Smith's recent treatment at Bellevue and the public health care mission of the facility, that he definitely should have been arrested, since he could have been seeking help.

At 7:30 A.M. on January 4, Smith sought treatment for lower back pain in Bellevue's emergency room. He was physically examined, no abnormalities were found, and the examining physician opined that he was "procrastinating". Afterwards, Smith was allowed to remain in the lobby due to the cold weather.

Smith was next sighted at Bellevue at around 2:30 P.M. on January 7, 1989, the day of the murder. The wife of the manager of the newsstand in Bellevue's main lobby observed an unshaven man wearing a long, dark coat and worn out shoes, whom she later realized was Smith, perusing pornographic magazines at the newsstand. She had her husband send him away.

Early the next morning, Dr. Hinnant's body was discovered. The lower part of her body was unclothed, and, in addition to sexual violation, she had suffered strangulation and blunt trauma.

Smith's subsequent videotaped statement to police alleged that on the day of the murder, he was living on the 22nd floor of the hospital. He woke up, went down to the 7th floor where he met a man named "John", and the two agreed that they would steal to earn money to buy food. They went to the 2nd floor where Smith, wearing doctor's clothing, picked up a piece of electric cord. Next, they allegedly proceeded to the 4th floor, looked into Dr. Hinnant's office, tried unsuccessfully to pick some locks along the corridor, then returned to Dr. Hinnant's office. Smith presented himself as a doctor and asked if he could speak with her. "John" then pushed past him, punched Dr. Hinnant in the face and Smith began choking her, first with his arm around her neck, then with the electric cord. He claimed he never intended to kill her. While he stole her jewelry and rifled her purse, "John" raped her. Thereafter, Smith took most of the stolen property to the Wards Island men's shelter, hoping to get someone to sell it for him for food. His statements to shelter residents led to his arrest.

Following up Smith's statement about living on the hospital's 22nd floor, the location of the building's ventilation and air-

conditioning systems, investigators found a hospital bed there, some empty beer cans and an empty pack of cigarettes, but no forensic evidence linking Smith to the bed or the area. Hence Smith's claim could not be proven. Moreover, the evidence indicated that this area was inspected three times daily and that a key was required for access from the stairwell. Smith also made statements about his wanderings around the hospital dressed as a doctor, where he allegedly observed surgical procedures, dined in the "doctors' dining room" quarters; however, these statements were unsubstantiated. A psychiatrist, after interviewing Smith, concluded that "John" was a delusion and that Smith was delusional at the time of the crime and entitled to the insanity defense. Smith admitted to the police that "John" did not exist.

The question on this appeal is whether or not the trial court erred in denying plaintiff's motion to set aside the jury verdict for defendants as against the weight of the evidence.

As was stated in *Nordhauser v New York City Health & Hosps. Corp.* (176 AD2d 787, 789): "the courts may set aside a jury verdict and grant a new trial when the jury's determination is palpably incorrect and a substantial injustice would be done if the verdict were sustained (*see, Nicastro v Park*, 113 AD2d 129, 133). A weight of the evidence inquiry involves a balancing of many factors (*see, Cohen v Hallmark Cards*, 45 NY2d 493, 498-499). The operative factor in the court's determination as to whether to set aside a jury's verdict is a finding that the jury could not have reached its verdict on any fair interpretation of the evidence (*see, Nicastro v Park, supra*, at 134)."

The Trial Judge correctly deferred to the jury's verdict here, which was based upon a fair interpretation of the evidence and was not palpably incorrect. Plaintiff, conversely, failed to sustain his burden of proving by a preponderance of the evidence that defendant Health and Hospitals Corporation did not provide a reasonable, minimal security system at Bellevue at the time in question, given the foreseeable harm (*see, Miller v State of New York*, 62 NY2d 506; *Nallan v Helmsley-Spear, Inc.*, 50 NY2d 507).

The record, taken as a whole, clearly demonstrates that based upon what HHC knew, it reasonably met its security obligations in general, as well as with individual regard to Steven Smith.

For example, the witnesses' testimony and the hospital's carefully maintained security log established that the 65 to 70

person security force was deployed around the clock throughout the hospital grounds, including the 22-acre "new" building, in both uniform and plainclothes and at both stationary posts and roving patrols. This evidence also reflected a consistent, daily effort to maintain security in all areas requiring it, including stairwells and the doors between stairwells and floors, and to handle promptly the numerous reports of unauthorized persons, whether patients in the wrong location or trespassers. The evidence also placed these efforts in their proper context, i.e., Bellevue's institutional mandate, the thousands of visits made annually, the high percentage of violent, criminal or otherwise antisocial patients, and the various constraints to be observed, such as keeping fire safety doors unlocked and sheltering the homeless on "cold alert" days.

The evidence also established defendants' reasonable, responsible security approach to Smith, the assailant, in terms of his probable, i.e., foreseeable, conduct. His extensive hospital records and the security log from the relevant time frame indicated only tendencies towards dubious threats of suicide, drug abuse, elopement from his assigned room, petty theft and trespass, but no credible evidence of violent tendencies toward others. By way of contrast, the security log reflected the presence of other more problematic patients and the more careful handling accorded them. Nor is it clear that a lapse of reasonable security contributed to Dr. Hinnant's murder. The credibility of Smith's statements as to his movements on the day of the murder must be strongly discounted given his admitted invention of his criminal cohort "John", and his unsubstantiated, unlikely claims of access to various hospital areas, existent and nonexistent, not to mention his history of mental illness and drug abuse.

Certain of plaintiff's allegations are not supported by the record considered in full. While witnesses for HHC stated that a description of Smith was not circulated to all hospital personnel after his arrest for the January 1, 1989 burglary, they also stated that such a procedure would be "unwieldy" and unwarranted, since he was a patient and would have to be permitted on premises for treatment despite the fact of his arrest. The witnesses conceded that such security measure might have been appropriate for the 16th and 17th floors. However, the jury was entitled to consider this question in light of all of the evidence it heard regarding the reasonableness of Bellevue's security, and was not bound to reach a conclusion favorable to plaintiff.

Similarly, it cannot be said that defendant did not make diligent efforts to evict potentially dangerous drug-addicted trespassers who were illegally residing on the premises. The record shows that hospital employees were to notify security of unauthorized persons on the premises and that these complaints were investigated promptly and handled appropriately, depending on whether it involved a patient outside of his assigned room or a trespasser. Homeless persons found in the hospital basement were ejected. Moreover, the roving patrols of the various areas of the hospital also addressed this problem. As for the 22nd floor, the allegation that a trespasser may have been living there was speculative and there was credible evidence that the area was inspected routinely three times a day and that a key was required for access from the stairwell.

The allegation that HHC failed to secure obvious hospital entryways flies in the face of voluminous record evidence to the contrary, as referenced above. This is particularly true with regard to the basement, where HHC deployed a 24-hour manned security post, two pull-down gates used at night and on weekends, and a second officer deployed at one of the gates when it was up.

Plaintiff, in sum, on his motion to set aside the verdict as against the weight of the evidence, as well as on this appeal, has ignored the evidence that did not comport with his point of view and would have us consider only that favorable to him (*see, Maharam v Maharam*, 235 AD2d 226). The jury, upon consideration of all of the evidence, properly exercised its right to determine what evidence, or portions of evidence, it believed or disbelieved (*see, Cohen v St. Regis Paper Co.*, 64 NY2d 656; *Moore v Leaseway Transp. Corp.*, 49 NY2d 720; *Accardi v City of New York*, 121 AD2d 489). The record clearly establishes and the jury properly found that defendant HHC set up a reasonable security plan under the circumstances* and meticulously implemented it. Having done so, it fulfilled its legal

---

* It is not clear that this hospital, which is run by a municipal entity, provides a high volume of burdensome public health services on behalf of the municipality, and whose security force consists of special patrolmen with powers similar to those of officers of the New York City Police Department, was functioning in a proprietary mode here as opposed to a governmental one. This is especially true, since it is being called into question for the way it chose to allocate resources for what, under these circumstances, amounts to general police protection (*see, Clinger v New York City Tr. Auth.*, 85 NY2d 957; *Weiner v Metropolitan Transp. Auth.*, 55 NY2d 175; *see also, Marilyn S. v City of New York*, 73 NY2d 910; *Bonner v City of New York*, 73 NY2d 930; *see also, Miller v State of New York*, *supra*, at 515 [Kaye, J., concurring]

obligation to plaintiff's decedent in that regard, although, sadly, it proved not to be enough. The law does not require, however, that the hospital act as an insurer and that its security system be flawless.

Accordingly, the judgment of Supreme Court, New York County (Ira Gammerman, J.), entered December 2, 1996, which, upon a jury verdict for defendants, entered judgment and costs against the plaintiff, should be affirmed, without costs.

ROSENBERGER, J. (dissenting). For the reasons below, I would reverse the verdict as against the weight of the evidence.

Despite believing that "the evidence was very strong in favor of the plaintiff" and stating that the plaintiff would have prevailed at a Bench trial, the Trial Judge denied the motion because of his general reluctance to disturb jury verdicts as a matter of principle.

While it is true that the size of the Bellevue Hospital complex (about 1,000 inpatients and 4,000 employees in 1989) and the nature of its clientele present special challenges for hospital security and communications among personnel, this is no reason to apply a more lenient standard. "[T]he general standard of care * * * placed upon hospitals within a community does not deviate according to their 'nature or size'" (*Vandenburgh v Columbia Mem. Hosp.*, 162 AD2d 880, 882). Nor does the fact that an institution's clientele are often violent or dangerous alter the context in which a jury must evaluate the allegedly negligent design and maintenance of the means of access to various areas of the building (*Yalkut v City of New York*, 162 AD2d 185, 188 [18-b counsel beaten by inmate due to negligent design of interview rooms]). To the extent that the jury considered these purportedly mitigating circumstances in giving the hospital the benefit of the doubt, it was in error.

On the contrary, these factors made it particularly important that New York City Health and Hospitals Corporation (NYCHHC) closely monitor the identity and location of persons legitimately present, provide functional locks at key access points and maintain adequate communications among security

[implying in dictum that a failure by the State, acting as landlord, to enforce a hypothetical policy of keeping all dormitory doors locked at all times on a large SUNY campus (similar to the kind of security measure plaintiffs suggest as appropriate here) would be so onerous an obligation for a security force as to amount to an allocation of police resources, i.e., transforming the State's role from proprietary to governmental in that regard]).

personnel. This they failed to do. The hospital's defense emphasized its discretionary power to determine the number of security guards allocated to a given area and the frequency of their patrols, but this was only one aspect of the problem. Perhaps even more important were the numerous foreseeable risks posed by unsecured doors and gates and by the failure of employees other than security personnel to issue adequate warnings about a specific, known, dangerous individual—risks for which an increased police presence could not wholly compensate, precisely because Bellevue is a hospital and not a prison.

A serious risk of dangerous intruders existed at the hospital. Many of Bellevue's patients had substance-abuse problems, a history of violent antisocial behavior, or other mental disorders. The basement of the hospital also connected to a tunnel which led to a shelter where many persons with similar problems resided.

Steven Smith himself, when he was a patient at the hospital shortly before the murder, had threatened homicide in a doctor's presence. He was also a drug addict with a history of delusions and hallucinations. In the days after his discharge, he gained unauthorized access to the hospital several times and once committed burglary there, even masquerading as a doctor at one point in order to avoid eviction.

The evidence presented at trial showed numerous flaws in the defendant's security system, especially regarding its handling of Smith. Due to the high volume of traffic between the shelter and the hospital, the gate separating the tunnel from the basement was not locked during the day. Security personnel regularly patrolled the basement, as well as the other areas of the building, but a permanent security guard was posted only at the shelter end of the tunnel.

Once a person was in the basement, he had open access to the west stairwell, which ran up the entire building, and could enter the building without passing any security personnel. Moreover, the locks on the stairwell doors, which opened onto each floor of the hospital, were frequently rendered inoperable (usually jammed or taped) by hospital employees who were in a hurry. The security patrols were supposed to check the locks regularly and remove the obstructions, but were often unable to keep up with the problem because the employees kept jamming the locks.

In particular, Quinton Carrigy, the Assistant Director of Security, admitted that the stairway door to the fourth floor

should have been checked on Friday night, as this floor was not well-populated on weekends and had been known to harbor intruders very recently. However, it was discovered on the Monday after Dr. Hinnant's murder that the lock was jammed, and Smith subsequently stated that he had gained access to the fourth floor through that door.

Not surprisingly, intruders routinely took advantage of this easy access to the hospital. Robert Frazier, the Assistant Director of Administration, testified that the hospital periodically discovered homeless intruders in the basement and evicted them. Moreover, Carrigy testified that a woman had been raped in the basement in December 1988—less than a month before Dr. Hinnant's murder.

According to the hospital security log, in the month preceding the crime, there were at least three reports of unauthorized persons living in the fourth floor locker room, and at least five reports of persons sleeping in other common areas and stairways around the hospital. Of special note is the fact that the Director of Security was notified that a trespasser seemed to be living on the 22nd floor, as evidenced by a mattress and food items, but no steps were taken to remedy this situation. After his arrest, Smith told the police that he had been living on the 22nd floor.

Though Smith's affinity for disguises, deception and trespass, as well as his severely unbalanced mental state, quickly became evident to hospital personnel who had contact with him, the hospital repeatedly failed to ensure that the staff could keep track of Smith's whereabouts. For instance, on January 3 and 4, the nurses and security staff who noticed Smith wandering the hospital were not aware that he was a trespasser because the hospital had not issued a bulletin regarding him. At trial, the Director of Security and the President of NYCHHC both conceded that considering Smith's history and his recent arrest, the hospital should have made greater efforts to keep him out.

Smith was admitted to the emergency room on January 4, complaining of lower back pain. Though the staff determined that he was malingering, he was not ejected, but instead was allowed to remain in the lobby because of the weather. (Under the City's "cold alert" policy, the hospital allowed homeless persons to remain in the lobby when the temperature was below freezing.) These cold temperatures persisted through the date of the murder, which is presumably why Smith was never ejected.

Frazier testified that the emergency room physicians should have been notified of Smith's recent arrest. If it was too cold to send him out onto the street, they could have placed him in a hospital police cell.

Indeed, the evidence clearly supports the conclusion that, even giving credence to defendant's claim that it was too unwieldy to notify *all* personnel of Smith's arrest, it was both feasible and necessary to alert the emergency room staff, given Smith's penchant for falsifying emergency illnesses in order to resume trespassing and committing crimes at the hospital.

On the afternoon of January 7, Smith robbed, raped and strangled Dr. Hinnant as she was working in her office. He told the police, and later testified, that he had left the 22nd floor, where he was living, in search of items to steal. He and "John", an alleged accomplice (believed by Smith's psychiatrist to be a figment of his imagination), entered the fourth floor through the stairway door and accosted Dr. Hinnant in her office. However, at later points in his testimony, Smith denied making these statements.

In light of the above facts, the plaintiff contends that NYCHHC failed to maintain minimal security with respect to trespassers generally and Smith in particular.

NYCHHC argues that the trial court erred in rejecting NYCHHC's contention that the plaintiff was required to prove the existence of a special duty. When a public entity is performing a governmental function, it cannot be held liable for negligence unless it is proved that the public entity assumed and breached a special duty of protection to the injured party (*Bonner v City of New York*, 73 NY2d 930, 932). For instance, providing general security against crime is a governmental function. The judiciary will not second-guess legislative and executive policy decisions about how best to allocate finite police resources (*Weiner v Metropolitan Transp. Auth.*, 55 NY2d 175, 182).

However, when the public entity is performing a proprietary function, it has the same negligence liability as a private entity. "It is well settled that where the State engages in a proprietary function such as providing medical and psychiatric care, it is held to the same duty of care as private individuals and institutions engaged in the same activity" (*Rattray v State of New York*, 223 AD2d 356, 357 [hospital negligent for allowing voluntary mental patient unsupervised access to unguarded window, where patient had history of escaping to assault others and such in fact occurred]). In addition, to the extent that

the public entity is acting as a landowner or landlord, it is performing a proprietary function (*Rubino v City of New York*, 114 AD2d 243, 246).

Where the public entity arguably performs a mixture of governmental and proprietary functions, "[i]t is the specific act or omission out of which the injury is claimed to have arisen and the capacity in which that act or failure to act occurred which governs liability, not whether the agency involved is engaged generally in proprietary activity or is in control of the location in which the injury occurred" (*Weiner v Metropolitan Transp. Auth.*, 55 NY2d, *supra,* at 182). Thus, the special-duty rule will not apply when the basis of the claim is that the public entity breached its duty as a landlord to maintain the premises in a safe condition. In *Rubino* (114 AD2d, *supra,* at 247), the Court held that although operating public schools is generally a governmental function, a school was liable as landlord where it failed to protect a teacher against a known risk of falling debris in the schoolyard.

The State and the City have often been held liable in a proprietary capacity as landlords where various public entities failed to install or repair security devices or otherwise maintain safe premises. In *Platovsky v City of New York* (199 AD2d 373), a resident at a hospital run by the defendant NYCHHC was sleeping in the "on call" room. When he left the room to check on a patient, he was stabbed by an intruder in the stairway. He sued the City for failing to take minimal security measures. The defendant's motion for summary judgment based on the special-duty rule was denied. "Here the act complained of constitutes a proprietary function when performed by the City, not a governmental function" (*supra,* at 374).

Similarly, in *Miller v State of New York* (62 NY2d 506, 513-514), the State was found negligent for failing to provide locks on the entrances to the dorms on a SUNY campus, thereby allowing an intruder to enter the laundry room and rape a student. The Court of Appeals specifically found that the claim related to the State's proprietary function (*supra,* at 511). In *Belle v New York City Tr. Auth.* (157 Misc 2d 76, 80), the special-duty rule was held inapplicable where the alleged negligent act was the defendant's failure to change a sign at street level indicating that a locked subway entrance was open, creating an unsafe vestibule where plaintiff was trapped and assaulted after descending by mistake.

In the instant case, the trial court properly denied the defendants' request to instruct the jury on the special-duty

rule. Operating a hospital is a proprietary function. Moreover, the plaintiff's negligence claim was largely based on the defendants' failure to maintain the stairway locks, lock the tunnel gates and evict squatters, which are all aspects of the defendants' proprietary duties as landlords. The trial court applied the appropriate standard of care, namely, that the defendants had a duty to provide minimal security to the plaintiff's decedent.

The plaintiff asks this Court to set aside the jury verdict on the grounds that the finding of no negligence was against the weight of the evidence. "[T]he Appellate Division has sweeping authority to review the trial evidence" and may order a new trial "when the jury's determination is palpably incorrect and a substantial injustice would be done if the verdict were sustained" (*Nordhauser v New York City Health & Hosps. Corp.*, 176 AD2d 787, 789). In *Yalkut v City of New York* (162 AD2d 185, 188), this Court explained the guidelines for determining that a verdict is against the weight of the evidence: "In distinction to the harsher 'no rational basis' standard which must be overcome before concluding that a jury verdict, as a matter of law, is not supported by sufficient evidence, the question of whether a jury verdict is against the weight of the evidence involves a less rigorous standard and is essentially a discretionary and factual determination involving a balancing of many factors * * *. The operative consideration in invoking the court's discretion in the latter case is a finding that the jury could not have reached its verdict on any fair interpretation of the evidence."

This distinction between "weight" and "sufficiency" standards of review means that in the former case, the court need not determine that there are no triable issues before it can set aside the verdict (*Nicastro v Park*, 113 AD2d 129, 135). If "the unsuccessful litigant's evidentiary position was particularly strong compared to that of the victor" (*supra,* at 136), the court has greater discretion than if the jury resolved "sharply conflicting evidence" in favor of one side (*supra,* at 134).

As the facts of *Yalkut* (162 AD2d, *supra,* at 185-188) show, certain security procedures are so inadequate that the only fair interpretation of the evidence is that the defendants were negligent. The plaintiff, a defense attorney, had arranged to meet with a prisoner who was a potential defense witness. He was beaten by this prisoner in the interview room. The Department of Correction, but not the lawyer, knew of the inmate's violent tendencies. However, the interview room in the base-

ment of the courthouse lacked a divider between lawyer and witness, and the only security guard was stationed at the other end of a long corridor at right angles to the room, such that he could neither see nor hear what happened inside the room. "Just a month earlier, [another] inmate had beaten an attorney in one of these booths, beyond the surveillance of the officers, but no steps were taken to remedy the situation despite this actual notice of the hazard involved." (*Supra,* at 188.)

The jury verdict apportioning most of the negligence to the plaintiff was set aside as against the weight of the evidence, as the Court found that the design and security of the interview arrangements were clearly negligent whereas the plaintiff had no reason to know of the danger (*supra,* at 188).*

Courts have frequently found negligence, based on a failure to provide minimal security, when the landlord or manager of a building that has a history of dangerous trespassers and broken security devices has made no serious effort to rectify these problems despite having notice of the risks. In *Jacqueline S. v City of New York* (81 NY2d 288, 295), the Court of Appeals found that the New York City Housing Authority had failed "to supply even the most rudimentary security" at the housing project. None of the doors to the lobby or the roof of the public housing complex had locks. The assistant superintendent knew that drug addicts were sleeping in the stairways and corridors and on the roof. The plaintiff was raped by an intruder in the building (*supra,* at 291-292).

In *Beatty v National Assn. for Advancement of Colored People* (194 AD2d 361, 362, *lv denied* 82 NY2d 662), the owner/manager of the building had notice of the broken locks and security system and of drug dealing by various tenants, but did nothing to fix the broken devices or evict these tenants, whose activities led to two violent assaults on the plaintiff superintendent. This Court upheld the jury's finding that the defendant's failure to maintain minimal security was the proximate cause of the plaintiff's injuries (*supra,* at 363).

The plaintiff in *Skaria v State of New York* (110 Misc 2d 711) was a nurse at a public hospital. She lived in an apartment building for hospital employees, which was owned and managed by the State. For tenant security, the lobby door was locked and equipped with a self-closing device. In addition,

---

* Though the Court did not explicitly discuss the special-duty rule, it presumably did not apply because the negligence complained of involved the design of the rooms, rather than the number of guards allocated to this area.

every night at 8:00 P.M., the superintendent was supposed to program the elevators so that they would not go to the basement (*supra,* at 711-712). However, the door had not been locking securely for several months and the building management had not fixed it properly despite repeated requests. Unbeknownst to the plaintiff, the security force had also been deprogramming the elevator at night so they could use the basement as a changing room.

When she came home from work one night, the plaintiff was accosted by an intruder in the elevator, who took her to the basement and raped her. Had the elevator been programmed properly, he would have had no secluded place for the assault (*supra,* at 713-714). The court found that the State was negligent: having set up security procedures indicating that it was aware of the danger of intruders in the basement, the State failed to ensure compliance with those procedures (*supra*).

The fact that a defendant "made no meaningful effort to comply with its own rules and policies" regarding security has been considered evidence of negligence (*Wyatt v State of New York,* 176 AD2d 574, 576). Liability has been imposed on defendants who recognized a foreseeable risk of criminal intrusion by instituting security measures, but who then neglected to supervise or maintain this security system (*Montag v Young Men's Christian Assn.,* 105 AD2d 1131, 1132). Liability may also be based on inadequate screening procedures for persons claiming a right of access to restricted areas of a building (*Prager v City of New York Hous. Auth.,* 112 Misc 2d 1034, 1036 [court found negligence where superintendent's office would unlock apartment doors for persons claiming to be tenants' family members without asking for reliable ID]).

Defendant NYCHHC admittedly did not take adequate measures to enable its staff to identify unauthorized persons on the premises (*see, Prager v City of New York Hous. Auth.,* 112 Misc 2d 1034, *supra*). Given Smith's penchant for roaming all over the hospital, staff throughout Bellevue should have been alerted to watch out for him and (after the burglary incident) to place him in custody. Moreover, the defendant did not make diligent efforts to evict potentially dangerous drug-addicted trespassers who were illegally residing on the premises (*see, Beatty v National Assn. for Advancement of Colored People,* 194 AD2d 361, *supra; Jacqueline S. v City of New York,* 81 NY2d 288, *supra*). The defendant failed to secure entryways at key points where intruders were foreseeable,

such as the basement and the stairs (*see, Skaria v State of New York*, 110 Misc 2d 711, *supra*), even though someone had been assaulted by an intruder who entered through this unsecured area only a month previously (*see, Yalkut v City of New York*, 162 AD2d 185, *supra*). Finally, the defendant inadequately supervised a disturbed patient who had shown a propensity to escape from his room, deceive the staff and commit crimes (*see, Rattray v State of New York*, 223 AD2d 356, *supra*). In short, the jury's verdict of no negligence was unsupported by "any fair interpretation of the evidence" (*Yalkut v City of New York*, *supra*, 162 AD2d, at 188). The defendant's lax security measures greatly increased the risk to Dr. Hinnant, and a "substantial injustice" would result if the finding of no liability were upheld (*Nordhauser v New York City Health & Hosps. Corp.*, *supra*, 176 AD2d, at 789).

Accordingly, I would set aside the verdict and order a new trial.

MILONAS, J. P., and WALLACH, J., concur with WILLIAMS, J.; ROSENBERGER and MAZZARELLI, JJ., dissent in a separate opinion by ROSENBERGER, J.

Judgment, Supreme Court, New York County, entered December 2, 1996, affirmed, without costs.