■ CALOGERO CANDELA et al., Appellants, v NEW YORK CITY SCHOOL CONSTRUCTION AUTHORITY et al., Respondents. [950 NYS2d 123]—

Plaintiff Calogero Candela alleges that he was injured on August 6, 1999, when a 70-pound window sash crashed down on his back while he was leaning through the window to scrape hardened concrete residue from the outside window ledge. Plaintiff was employed by the subcontractor responsible for debris removal in connection with the construction of West Side High School in Manhattan. The project owner was defendant New York City School Construction Authority, and the general contractor was defendant Spacemaster Building Systems, LLC. Spacemaster fabricated the major structural components off-site and then trucked them to the school location. Defendant TDX-Becom was brought in to act as construction manager approximately one or two months before the accident. The windows were installed by nonparty Window Associates pursuant to a contract with Spacemaster. The factory-assembled double-hung windows consisted of two window sashes in vertical alignment within a frame. The bottom sash opened by sliding up within the frame and the top sash opened by sliding down within the frame.

Franklin Bradley, who was plaintiff's coworker on the day of the accident, testified that during the two weeks he worked at the building before the accident, the weather was particularly hot, and the building was not air-conditioned. Because of this, Bradley stated, workers had opened about 50% of the windows in the building. He explained that about 50% of the open windows would not stay up on their own, and that workers had

resorted to propping them up with sheetrock, bottles, and sticks. Bradley testified that workers commonly referred to the windows that had to be propped up as "free fallers." According to Bradley, the window through which plaintiff was leaning had been propped up three feet, the window's maximum opening capacity, and secured with a piece of sheetrock. He testified that after he lifted the window off of plaintiff's back, he noticed that the sheetrock that had been holding the window open was in pieces on the floor. He stated further that when he told site manager Ivan Badinsky, an employee of TDX-Becom, what happened, Badinsky responded, "Those God damn windows are falling shut all over the job site," and said that he had "to get the window people in there before somebody else gets hurt or killed."

Other than the window that injured him, plaintiff himself did not observe any windows propped open during the two weeks he worked at the building before the accident. However, he testified that when he informed Badinsky of the accident, Badinsky responded that he was not surprised because he had almost gotten his hand or his finger "chopped off" on an occasion when a window had collapsed. Badinsky denied making the statements attributed to him by plaintiff and Bradley, and testified that he was never made aware of a problem with the windows before the accident, nor did he ever notice windows being propped up. He also testified that "limit stops," which are devices that prevent windows from being lifted above a desired height, were not installed until after the work was complete.

Charles Roberts, the owner of Window Associates, testified that he received a call from Spacemaster, while the project was still ongoing, informing him that there was a problem with the "balance" system, which was designed to keep the windows from falling when opened. The caller stated that the windows could not be lifted up without falling back down. Roberts testified that during his walkthrough of the job site, he observed that almost all of the windows in the building were open, and that half of the open windows were propped open with objects such as two-by-fours, soda cans, and dry wall. Roberts explained that, upon observing the windows, he discovered that they were falling because the balances were broken. He also observed that most of the windows did not have limit stops in them, although some could be found on window sills or on tables inside the building. He explained that by taking out the limit stops, which he testified, in contrast to Badinsky's testimony, were installed at the factory, the workers were able to push the windows up to their maximum height. Doing so, however, would place inordi-

nate stress on a spring inside the balance system, breaking the balance. Roberts stated that he reported his observations to Spacemaster, which, five weeks later, authorized him to order 36 new limit stops, as well as replacement parts for the balance system.

While Roberts had no independent recollection of the precise date on which he came to the site to perform the inspection, he testified that it was during a blackout in Washington Heights, where he went after the inspection. He described the environment in upper Manhattan that day and evening in vivid detail. For example, he recalled that "[t]he streetlights were out. Most everybody was out on the street. It was a very hot day. You could see that all the windows were open in the buildings because there was no air-conditioning going on . . . The traffic lights were blinking. They were all out. The traffic was—it wasn't like rush hour, but it was kind of a mess . . . It was a mass of people out on their stoops and sidewalks and the streets, hanging out of the windows."

An engineer from Consolidated Edison testified that a "consistent blackout, which is a complete system outage" occurred in Washington Heights on July 6-7, 1999. The engineer testified that there were no other blackouts or brownouts (localized blackouts) in the area from June 1, 1999 through August 6, 1999, the day before the accident. He also testified that on July 8, 1999, there was a "dip" in power, which lasted 15 seconds. There were no other dips lasting more than two seconds. There were some "feeder" outages which occurred during the two days *after* the accident, but the engineer explained that such outages do not necessarily cause customer interruption of service, nor did he have any evidence that the feeder outages on those two days did in fact cause any interruption.

The jury returned a verdict in favor of defendants. The verdict sheet did not ask the jury to determine whether plaintiff satisfied the various elements of his claim as to each defendant. Rather, it merely asked the jury to state whether each of the defendants violated Labor Law § 200. The court denied plaintiff's motion to set aside the verdict as against the weight of the credible evidence.

As this Court has noted, "[T]he question of whether a jury verdict is against the weight of the evidence . . . is essentially a discretionary and factual determination" (*Yalkut v City of New York*, 162 AD2d 185, 188 [1990]), and "great respect must be accorded to the trial court's professional judgment," which is informed by its observation of the witnesses (*id.*). "Only where the jury's resolution of a factual issue is clearly at variance with

the proffered testimony does the failure to set aside the verdict and direct a new trial constitute an abuse of discretion" (*Fisk v City of New York*, 74 AD3d 658, 659 [2010] [citation omitted]).

As noted, the jury was not asked to state on the verdict sheet whether plaintiff satisfied the various elements of a claim under Labor Law § 200 as to each defendant. Accordingly, it is impossible to determine conclusively whether the jury believed that plaintiff met any of the elements. However, Badinsky testified that he filled out an incident report that described the accident in a manner consistent with plaintiff's own version. Badinsky further acknowledged that the condition that caused the accident was unreasonably dangerous. In light of those admissions, and the fact that the vast majority of the questioning during direct and cross examinations at trial concerned whether defendants knew or should have known about the condition before the accident, it is reasonable to assume that the jury's verdict was based exclusively on a finding that defendants did not have actual or constructive notice of the defective window. Moreover, plaintiff's motion to set aside the verdict as against the weight of the evidence, and his appeal of its denial, are based solely on the notice issue.

Notice is necessary for a plaintiff to prevail on a Labor Law § 200 claim (*Mitchell v New York Univ.*, 12 AD3d 200, 201 [2004]). The evidence is uncontradicted that Charles Roberts discovered the problem with the windows and reported the problem to Spacemaster, on July 6 and 7, 1999, weeks before the accident. Roberts described conditions on the day of his visit to the site that are consistent with his recollection that a major power outage occurred that day. The testimony of the Con Edison engineer supported this recollection by establishing that there was a blackout that day.

We reject defendants' supposition that the loss of power observed by Roberts was actually caused by one of the feeder outages described by the engineer as having occurred during the days immediately following the accident. First, there is no evidence that those outages resulted in an appreciable loss of power. Further, there is nothing in the engineer's testimony that would support the idea that, even if a feeder outage had resulted in lost power, it would have created the dramatic scenes described by Roberts. While defendants now question how the traffic lights could have blinked on and off during a blackout, they failed to present any evidence that it would have been impossible for the lights to blink during a power outage. Defendants attempt to cast further doubt on Roberts's testimony that he identified the problem before the accident by pointing to

the "expedited order form" by which Window Associates ordered 36 limit stops on August 11, 1999, four days after the accident. However, Roberts testified, without contradiction, that he reported the need to order those parts to Spacemaster immediately after his inspection and that he had no control over the length of time they waited to authorize him to place the order.

Because the jury had no reasonable basis for rejecting Roberts's testimony that he identified a problem with the windows before the accident, it did not act rationally in determining that defendants did not have, at the very least, constructive notice of the defective windows. Obviously, Spacemaster had actual notice, since according to Roberts's uncontroverted testimony, Spacemaster ordered the inspection. It can also readily be inferred, however, that the other defendants had notice. The problem identified by Roberts existed throughout the building, and Badinsky's testimony that he did not notice it is simply not credible, given that he walked the site on a frequent basis. We note that it is irrelevant whether defendants were aware that the particular window that injured plaintiff was broken. Once they knew that an appreciable number of the windows required attention, defendants had an obligation to inspect all of them (see Rodriguez v Amigo, 244 AD2d 323, 325 [1997]).

In view of this determination, we need not address plaintiffs' argument that the trial court's failure to issue a missing witness charge constituted reversible error. Concur—Mazzarelli, J.P., Acosta, Renwick and Richter, JJ.